Morgan *v*. Rose.

---

NOVEMBER TERM, 1871.

Morgan and others, appellants, and Rose and others, respondents.

1. The act to incorporate the trustees of religious societies does not, *proprio vigore*, do more than vest the legal title in the ecclesiastical property in such trustees.

2. The statute was designed to create a simple trust, so that the trustees must hold and dispose of the property in conformity to the directions of their *cestuis que trust*, who may be, either the congregation, or certain officials, according to the rules or discipline of the particular church or society.

3. Where the question is whether a certain act done by the trustees in their corporate capacity, be within or without their power, the corporation is a proper and necessary party; but where such act has been enjoined, the injunction will not necessarily be dissolved on account of the non-joinder of such party.

4. The general rule is that an appeal will lie from all orders either granting, refusing, sustaining, or dissolving injunctions.

*Mr. P. L. Voorhees* and *Mr. Browning*, for appellants.

*Mr. A. C. Scovel* and *Mr. J. Wilson*, for respondents.

The opinion of the court was delivered by

THE CHIEF JUSTICE.

The complainants in this suit are members of "The Baptist Church of Camden." One of them was, at the time of the commencement of these proceedings, the pastor, and four of the others were trustees of this church. The bill is exhibited in behalf of the complainants, and such other members as may choose to come in. Of the defendants, five claim to be trustees, the rest being members of the congregation. On the 3d of June, 1869, those of the defendants who claim to be trustees met at the church building, on a call of the board, and passed a resolution, wherein, after referring to a certain resignation of the pastor, and reciting that "whereas, as well before as since such resignation, feelings of discontent touching the said pastor threatened and do threaten to disturb the peace of the church, which may lead to violence among its members," it was declared that, "in order to avoid all disorderly or unchristian proceedings, at times of public worship or business, this board deem it prudent, and therefore order, that the church edifice be closed against any meetings for public worship or business until after the first day of July next, and the further order of this board," &c. In conformity with this resolution, the church was closed, and the congre-

gation prevented from its use on Sundays and at other times. Subsequently, the complainants getting possession of this building, caused it to be thrown open to the congregation, and it is the main purpose of the present bill to restrain the defendants, by injunction, from closing this meeting house, and preventing its being used as a place of worship and business.    An injunction having been granted, was retained on a motion, founded on the bill and answer, to dissolve.    The present appeal brings up for review this action of the Chancellor.

The claim of these appellants to a dissolution of this injunction must, in my opinion, rest entirely on the foundation that they possess, as the trustees of the church in question, the authority to decide when, and under what circumstances, the church edifice is to be used by the congregation.    Upon the argument the case of the appellants was properly put upon this ground, and it was strenuously urged that the control of the trustees over the meeting-house was unlimited, except to the extent that they were bound to exercise a fair and honest judgment upon the subject.    This same position is assumed in the answer, and the substantial question therefore to be solved, is as to the extent of the power of these trustees over this place of worship.

" The Baptist Church of Camden," has been duly incorporated by force of the provisions of the act of the legislature of this state, entitled "an act to incorporate trustees of religious societies." *Nix. Dig.* 802. As the present defendants do not pretend that they have any authority except that which they derive from this statutory source, the language and meaning of this law is the primary subject of interest in this investigation.

The title of this statute appears to me very clearly to indicate its purpose, which is expressed to be " to incorporate trustees of religious societies."    It is not its office to incorporate the society itself, but to confer certain definite franchises on a select body of such society.    With this view, the first section of the act provides that every "religious society or

congregation of christians" is authorized to assemble upon a certain notice, and, by a plurality of voices of those present to elect any number not exceeding seven as trustees. The same section then declares that the trustees thus chosen are thereby constituted a "body politic and corporate in law." It will be observed that it is but a chosen part of the society that is converted into a corporation. There are then other provisions adapted to the purpose of continuing the line of trustees, and settling certain minor details. But it is the third section which confers upon the trustees all the power which they possess. This is its language: "The said trustees and their successors shall, by such name of incorporation, be able and capable to acquire, purchase, receive, have and hold any lands, tenements, hereditaments, legacies, donations, moneys, goods, and chattels, in trust for the use of the said society or congregation, to any amount in value not exceeding two thousand dollars a year, and the same, or any part thereof, to sell, grant, assign, demise, alien, and dispose of, to sue and be sued, implead and be impleaded, in any court of law or equity; to make use of a common seal, and the same to alter and renew at their pleasure."

The language here used is altogether certain and unambiguous. The legislative intent is plainly stated. The provision is, in substance, this: the temporalities of the church are put in trust, without limitations, for the use of the congregation. This being the clear intent, the only inquiry is as to the legal effect of such a disposition of property. If the learned counsel of the appellants had not expressed, on the argument, the views which they did, I should have thought that this was a subject concerning which, among lawyers, a difference of opinion could not exist. But notwithstanding all the respect which I entertain for the views thus presented, on account of the source whence they proceeded, my reflections on the subject have served but to confirm my original impressions, that such views are unfounded in principle and irreconcilable with all authority. That this statute, *proprio vigore*, creates merely

a simple trust, appears to me incontestable.    This kind of
interest arises whenever property is vested in one person
upon trust for another, and the nature of the trust, not being
defined in the settlement, is left to the construction of the
law.    This is precisely what the statute under examination
does; the property is put in the hands of the trustees in
trust for the congregation; but there is not a word in the
act which tends towards a definition, or description, or limi-
tation of such trust; and I do not know that in any dictum
or in any adjudged case, a doubt has ever been expressed as
to the fact that, by force of such a settlement, the trustee is
a mere depositary of the property, and that the *cestui que
trust* has both the *jus habendi,* or the right to be put in the
actual possession of the estate, and the *jus disponendi,* or
the right to call upon the trustee to execute conveyances of
the legal estate, as the *cestui que trust* directs.    It would
be superfluous to refer to books as vouchers of so familiar a
doctrine.    No one, I think, at all versed in this branch of
the law, can doubt that the language of the statute, if found
in a will or a deed, would have the effect thus indicated.    A
testamentary disposition vesting real and personal estate in
A, coupled with a power of sale, in trust for B, would place
in A nothing but the dry legal title, which it would be his
duty to hold in entire subservience to the wishes and direc-
tions of B.    And that, I think, was the precise purpose of
the statute in question.    It was not the legislative design to
establish one uniform government over the temporalities of
each church that became incorporated under its provisions,
but simply to provide flexible machinery, whereby each con-
gregation could hold, protect, and dispose of its property in
such manner, and for such purposes as might seem to it
best.    I have no idea that the framers of this act intended
that each society of christians who availed themselves of its
privileges, gave up, by such act, to the trustees thus selected,
all dominion over their property, real and personal; but, on the
contrary, I deem the purpose was, and such purpose seems
to me a most wise one, to put it in the power of every such

society to transmit its property in perpetual succession, by investing it with the requisite corporate capacities, leaving it to be disposed of, through this instrumentality, by either the whole congregation, or certain parts of it, or by such of its functionaries as should be clothed with such power by force of the ecclesiastical organization to which they might belong. I think, therefore, these trustees, as the holders of a simple trust, have no right, in equity, to control or dispose of the church property except as directed so to do by the *cestui que trust.* Whether the power to give such direction resides in the whole congregation, or in particular members, or in special officials, depends, in each instance, on the established usages or express regulations of the individual congregation, or of that wider ecclesiastical organization of which such congregation is a branch. But, as has been already stated, the whole effect of this statute is to create a general trust, making the trustees bare depositaries of the legal estate in the temporalities.

Nor have I found anything in the adjudged cases, nor any dictum contained in such cases, which conflicts, in any respect, with this conclusion. Indeed, in the opinion read in the case of *Den* v. *Pilling*, 4 *Zab.* 661, a construction is put upon this statute precisely similar to that above expressed. Its words, upon this point, are these : "It cannot be doubted, however, that the trustees of all religious societies hold the property subject to its appropriate use, and have no legal right to determine when the religious meetings shall be held, or who shall officiate, unless such power is given to them by the rules and discipline of the denomination to which they belong, and that they may be compelled, by proper proceedings at law or in equity, to fulfill their duty." It is true that this expression of opinion, coming into the case as a side remark, has not the force of a direct adjudication, but it has peculiar weight from the circumstance that, from the forcible language used, it is obvious that it did not occur to the judicial mind, that this act was susceptible of any other interpretation.

Upon the argument much stress was laid on certain expressions made use of in the opinion in the case of *Van Houten* v. *The First Reformed Dutch Church*, 2 *C. E. Green* 126; but an examination of the case will show that these expressions can be made to appear to favor the views of the appellants, only by being cited as disjointed fragments and separated from the context to which they belong. Some parts of this opinion, taken by themselves, appear, at first sight, to countenance the doctrine that these statutory trustees are competent to control at their discretion, and to dispose of the church property; but upon a closer scrutiny, it will be perceived that such parts relate to those particular trustees whose authority was then the subject of inquiry. That controversy was between the pewholders and the trustees, the latter being about to take down the church building, a proceeding opposed by the former class of persons, and the decision was that the power of the trustees was plenary for that and all other purposes relating to the ecclesiastical property. But the Chancellor does not say, nor intimate, that such authority was conferred by the statute; but, to the contrary, he clearly deduces such power from the particular regimen of the Reformed Dutch Church. On this point he thus plainly expresses himself: "Whether the interests of the church and congregation require that the church should be removed to another locality, is a question which the authorities of the state and of the *church* have wisely committed to the judgment and discretion of its board of trustees. In the Reformed Dutch Church in this state, the trust has been delegated to the consistory, a body consisting of the pastor, deacons, and elders of the church, the guardians at once of its spiritual and temporal interests." It was this dominion over the church property which the Chancellor held was not to be controlled by the wishes of the congregation, or of any branch of it; but it will be noticed that this was a dominion which proceeded not only from the statute, but, in fact, from the church government. The defendants in that case were, it is true, trustees possessing,

by force of the statutory law, the legal title; but they were likewise the consistory, and as such, clothed with absolute control over the ecclesiastical property. This case harmonizes with the views which I have already expressed with respect to the proper signification of the statute in question.

The cases of *Van Horn* v. *Talmage,* 4 *Halst. Ch.* 108, and *Doremus* v. *The Dutch Reformed Church,* 2 *Green's Ch.* 332, rest upon the same basis as that of the case to which reference has just been made; for they each involve the question as to the authority of trustees who are also the consistory of the Dutch Reformed Church, which, emanating as it does from the statute and the church polity, is, it must be admitted, unqualified and absolute. These cases, therefore, do not favor the contention of the counsel of the appellants. With respect to the New York decisions which were cited, they can throw but little light on the subject, from the circumstance that the statute of that state bears but a general resemblance to our own. So far, however, as such adjudications are applicable to the present topic of consideration, they are in aid of the conclusion that the authority of the religious society is supreme, except to the extent that such authority is taken away by the force of the legislative act.

My conclusion is that the trustees, who are appellants in this case, did not acquire, by the mere act of incorporation, the authority which they claim, to close the church building at their discretion. Nor can it be claimed that they are invested with such power by reason of the usages or discipline of the church which, in some respects, they represent. As this case is now presented to this court, it is clear that it is for the pastor and congregation to decide when the church shall be opened and when it shall be closed. An affidavit annexed to the bill states that the pastor and the society are the depositaries of this authority, according to the " customs, rules, and discipline of said church," and this affidavit stands in full force, without any attempt at contradiction or refutation. The plea advanced in the answer, that the act of the trustees in closing the meeting-house had the approval of

certain members of the church, as appears by their petition among the papers before the court, can have no effect. The members of the church, or of the spiritual body, can have no more control over the church edifice, or the times of worship, than the rest of the congregation; and even if such power resided in such members, their votes could not be legally taken except at a meeting regularly convened.

The result to which I have thus come, dispenses with the necessity of discussing the question whether, admitting the legal power of these appellants, as trustees, to close the church at their will, such authority was fairly exercised in this particular instance. I assume, for present purposes, that these officers were actuated by proper motives, and on that assumption I arrive at the conclusion already expressed, that they had no legal competency to do the act now in controversy. This view disposes of the merits of this litigation in its present stage.

But the case of the appellants was, in the next place, rested on an objection to the form of the complainants' proceedings. In the answer it is alleged that the corporate body, "The Baptist Church of Camden," is a necessary party to this suit, and that the omission of such party invalidates the order which was granted, directing an injunction to issue. Upon reflection, it seems to me that the corporation is a party indispensable to the legal propriety of this procedure. The act which is complained of, and which forms the gravamen of the bill, was done by the appellants *colore officii*. The defence is placed upon the claim that the church was closed by a regular order of the corporate authority, and one of the principal questions in the controversy, therefore, is as to the existence of such corporate authority. If the corporation can be interested in any question, it must of necessity be so in this question. It has, certainly, a right to be heard in its own proper person, when the extent of its authority is the matter to be adjudged. Without its presence in the suit, the decree, if adverse, will not bind it; nor, if in its favor, can it claim for such decree that quality of conclusiveness which,

in legal theory, is deemed to attach to every final determination of a court. I think, in this case, the church should have been made a party in its corporate capacity, a conclusion which will be found to harmonize with the opinion of Chancellor Walworth, in the case of *Lawyer* v. *Cipperly,* 7 *Paige* 282.

Upon the argument it was assumed that if this defect existed, the injunction must fall. But this is a fallacy. The general principle undeniably is, that a decree or order will not be made, affecting the rights of an absent party. But this rule, like most general rules, is liable to the control of the equities of the particular case, for it is but seldom that, in a court of equity, a mere form can defeat the ends of justice. The non-joinder of an essential party does not of necessity lead to the dissolution of an injunction; the general rule is that it will have that effect, but such rule is not universal. Even where a bill is demurred to on the ground of the want of proper parties, and such demurrer is sustained, the injunction does not inevitably fall, for in some cases the court will give leave to amend without prejudice to the injunction. Several cases to this effect are cited in Mr. Kerr's *Treatise on Injunctions, p.* 635. So it is correctly said in the same work, page 208, that "where there is a case for an injunction, and the injunction will operate for the benefit of parties not before the court, the absence of those parties, though a ground of demurrer to the bill, will not prevent the court from interfering." I think the true principle is, that when the injunction will have the effect of injuring, in any material respect, the rights of absent persons, the court will not, unless in case of special necessity, interfere with such rights, but that when the absence of persons as parties constitutes, so far as the granting or refusing of the injunction is concerned, a formal rather than a substantial defect, there is no ground arising from such fact for a refusal of the temporary aid of the court, if such aid appears, under the circumstances, to be equitable. The present case is a strong illustration of the propriety of these limitations on the usual rule

which exacts the joinder of essential parties. The defect now complained of is that the corporation has not been subpœnaed, but all the corporators, who are the trustees, are before the court; there can be no pretence that, on the motion to dissolve this injunction, the joinder of the corporate body could have had the slightest effect; every circumstance of defence which that body could have interposed, has been presented by the trustees; and upon motion it would be a matter quite of course to permit the complainants to amend their bill on the point to which exception is taken. Any peremptory rule which would require the Chancellor, under such conditions of the case, to dissolve an injunction substantially necessary for the protection of property or equitable rights, would be a blot upon the legal system, as it would injuriously subordinate equity to mere mode of proceeding. In my opinion, the Chancellor rightly exercised his discretion in refusing to withdraw, on this technical ground, the protective arm of the court.

There was a point made on the part of the respondents in the argument before us, that the injunction order in this case was not a proper subject of appeal. This objection under the view heretofore expressed, has become of no importance in this inquiry; but as a matter of practice it is of moment, and on that account has been considered by the court, and our unanimous opinion is that an appeal will lie from an order of this character. We consider the general rule, settled by the practice and recognized in the decisions, is that all orders either granting, refusing, sustaining or dissolving injunctions are appealable, unless in those few and exceptional cases where an order is so temporary in its operation, or so slightly affects the interest of the party on whom it operates, that such party cannot be said to be aggrieved by such order. This class of excepted cases belongs to the category of interlocutory orders in the cause, or orders resting in the discretion of the Chancellor. Of this latter kind, Chancellor Green appears to have considered the denial of the motion for an injunction in the case of the *Attorney-General* v. *The City of*

*Paterson*, 1 *Stockt.* 627. But that most orders appertaining to injunctions are appealable, is settled by the practice of this court, as will appear from the following cases : *Chegary* v. *Scofield*, 1 *Halst. Ch.* 525 ; *Doughty* v. *Somerville R. Co.;* 3 *Halst. Ch.* 629 ; *Attorney-General* v. *Paterson*, 1 *Stockt.* 628 ; 2 *McCarter* 501.

The order appealed from should be affirmed, with costs.

The whole court concurred.