Worrell *v.* First Presbyterian Church of Millstone.

WORRELL *vs.* THE FIRST PRESBYTERIAN CHURCH OF MILLSTONE.

1. An objection that the corporate character of the defendants does not sufficiently appear by the bill, and that no proper averments are therein made of ecclesiastical relations and rules, which have been waived or substantially supplied by the answer and proofs, cannot avail at the final hearing.

2. It is no valid objection to the action taken at a meeting of a congregation, that members of the congregation were absent, or being present did not vote. Where a society is composed of an indefinite number of persons, a majority of those who appear at a regular meeting constitute a body to transact business. The presumption is that all the members present who observe silence when a question is put, concur with the majority of those who actually vote—that is, if the question be put audibly and explicitly.

3. The pastoral relation is for religious and not mercenary ends, but the contract involved in it imposes pecuniary obligations and gives pecuniary rights which the law enforces and protects, and the surrender of those rights, when it involves matter of pecuniary loss, is lawful matter of pecuniary compensation, and is a valid consideration for a contract to pay money.

4. In Presbyterian societies the congregation are the substantial beneficial owners of the church property, and the trustees the legal instruments to execute their will.

5. Trustees have no legal right to attempt to defeat an agreement entered into by the congregation.

6. Where a congregation has agreed to allow a credit to its pastor of $2000 on a certain bond given to the corporation, and the trustees have acquiesced in that agreement, the pastor is entitled to an injunction to restrain an action at law upon the bond, and the trustees cannot, in such a suit, thwart the wishes or deny the power of their *cestui que trust.*

The cause was argued upon the pleadings and proofs, before the Vice-Chancellor.

*Mr. McLean* and *Mr. J. Wilson*, for complainant.

*Mr. W. H. Vredenburgh* and *Mr. Dixon*, for defendants.

Worrell *v.* First Presbyterian Church of Millstone.

THE VICE-CHANCELLOR.

The parties to this suit are the Rev. Charles F. Worrell, D. D., and the First Presbyterian Church of Millstone, in the county of Monmouth. The complainant was pastor of the church from the early part of 1842 to the 9th day of March, 1868, with an annual salary, prior to 1860, of $400, besides the use of the parsonage farm. The salary was afterwards raised to $600, of which $500 was actually paid. At a congregational meeting on the 25th of July, 1867, it was resolved, in view of the dilapidated condition of the parsonage, its distance from the church, and the existence of a debt for back salary, to sell the parsonage for $4000, and the trustees were directed to execute a deed to the purchaser. From the proceeds of sale the sum of $2700 was to be invested on bond and mortgage for the purchase of another parsonage, and the balance, after payment of the salary debt and some outstanding bills, was to be paid to the pastor for the improvements, buildings, materials, and repairs done by him on the premises during the previous twenty-four years. The interest of the invested fund was also to go to him while remaining the pastor, in lieu of the use of the parsonage itself, which use was included in his call. The refusal of the premises was given him at the specified price, and he accordingly became the purchaser. The deed was made for his use, at his request, to his son Henry, who gave back his bond and mortgage for $3000 of the price, the remaining $1000 being allowed in settlement of the indebtedness due Dr. Worrell. Henry Worrell afterwards conveyed to his father. Shortly after the sale, certain members of the congregation, about twenty in number, being dissatisfied with the ministrations of Dr. Worrell, memorialized the presbytery in regard to a dissolution of the pastoral relation, and that body appointed a committee of three ministers and two elders to visit the church and confer with its pastor and officers. A committee of the congregation, composed of nearly all of the elders, deacons, and trustees, met the presbytery committee at the church in Millstone, at two P. M. on Monday, the 28th of

October, 1867, and continued their discussions till late in the evening, without reaching a satisfactory result, when the committee of the congregation was requested to withdraw to enable the committee of presbytery to come to some conclusion and make some report. Upon again being convened, the chairman of the latter committee presented a preamble and agreement as a basis of settlement, proposing its adoption, then to be afterwards submitted to the congregation for its action, at a meeting to be called for that purpose. It was, in substance, an arrangement by which the pastor should tender his resignation, to take effect on the 9th of the following March, and in consideration of his so doing, of his long continued services to the church, of the scanty support he had received, and his inability to lay aside from it any provision for old age, a donation should be made him by a credit on the amount of the mortgage. Discussion ensued as to how large this credit should be, and different sums being named, it was finally fixed at $2000. The paper was then signed by eleven of the congregational committee, five of the signers being trustees, six being elders or deacons.

A meeting of the congregation was soon after called by a notice, as follows : " At the request of the officers of the First Presbyterian Church of Millstone, and of the committee of presbytery, there will be a meeting of the congregation of said church in the church edifice, on Wednesday, November 13th, 1867, at two o'clock P. M., for the purpose of considering and acting upon an agreement made by the officers of the church with the committee of presbytery to make a pecuniary consideration to the pastor, in view of his proposed resignation, and in case of his resignation, to appoint commissioners to presbytery." This notice was dated the 1st of November, and was signed by Isaac Hutchinson, trustee, and Austin Rue, elder ; both of whom had signed the agreement of the 28th of October.

The congregation met in pursuance of it, and was organized by the election of a chairman and secretary. The minutes of this meeting, signed by these officers and authenticated

by their testimony as witnesses, are in evidence. The preamble and agreement of the 28th of October were read, together with the minutes of that meeting, when the following was moved and seconded: "*Resolved*, That we, the congregation of the First Presbyterian Church of Millstone, Monmouth county, New Jersey, now assembled, in view of our pastor, Rev. C. F. Worrell, having spent all his ministerial life with us in ardent and successful labor, upon a salary entirely inadequate to his comfortable support, while expending much in behalf of the congregation, approve and ratify the action and proposal of the joint officers, trustees, elders, and deacons of the church, October 28th, 1867, in tendering him a pecuniary offering, and we, the congregation, hereby order that a credit be given him of two thousand dollars, upon the bond and mortgage held by the congregation upon the former parsonage farm, in his behalf as pastor." At this point three of the signers of the agreement, two being trustees and one an elder, denied signing the agreement as stated, contending that the paper had been altered and enlarged, and that they had only signed to bring the whole matter before a congregational meeting. After warm discussion, a motion to adjourn was negatived by a decided vote. The main resolution was then put and adopted by a large majority—first by uplifted hands, and afterwards by the voters rising in their seats. The chair decided that all the signers of the agreement presented by the presbyterial committee had thereby voted in the affirmative, and their votes would be so counted. Fifty-eight persons voted for the resolution. These, added to the eleven signers of the agreement, made the total affirmative vote, sixty-nine. The negative being put by the chair, twelve or thirteen votes were cast against it, as near as could be ascertained, as there was then some confusion in one portion of the house—a number of persons rising and going out.

A resolution was adopted directing a credit of $2000 to be put upon the bond, and prescribing its form. The pastor declared his purpose to resign his pastoral charge at the forth-

coming meeting of presbytery, and requested the congregation to appoint commissioners to presbytery to attend to the same. Four commissioners were appointed. On the 9th of the following December the presbytery met, and the pastor and commissioners appeared and were heard. The call for the congregational meeting and the minutes of that meeting were read, when one of the commissioners presented a protest, signed by himself and six members of the congregation, not commissioners. This protest concurred in and warmly recommended the dissolution of the pastoral relation, but remonstrated against the manner of it, and urged considerations at length why so large a credit should not be given.

The presbytery adopted the report of its committee appointed to visit the church, and declared the pastoral relation dissolved, to take effect from the 9th day of March next ensuing. It did so take effect. On the 21st of the following August Dr. Worrell paid to the president of the board of trustees the balance due on the bond, deducting the $2000 claimed as a credit; an endorsement of that credit having been by himself, or some of the church officers, more than once previously demanded and refused.

On the 10th of December, 1868, an action in the Supreme Court was begun on the bond in the name of defendants, when the complainant filed his bill to have such action restrained, the credit decreed to be allowed, and the bond and mortgage delivered up to be canceled. An answer was filed and the cause brought to hearing on the pleadings and proofs.

At the argument objections were made to the informalities and defective allegations of the bill : that the corporate character of the defendants does not sufficiently appear ; that no contract is set out with the corporation as such, and no proper averments are made of ecclesiastical relations and rules. Whatever force these objections might have had at an earlier stage of the cause, they cannot avail now. The defective allegation of corporate character and ecclesiastical rules have been waived or substantially supplied by the answer and proofs. The answer itself is defectively made, but the corporate

existence has been abundantly shown, and assumed by both sides to arise under the act to incorporate the trustees of religious societies. *Nix. Dig.* 802. The relations of the congregation to the presbytery, the authority and action of that body, and the book of government, have been recognized and relied on directly or implicitly by both sides in the proofs and the argument, and I therefore take them to be legitimate matters of consideration in disposing of the case.

A contract to credit complainant with $2000, if alleged in the bill to have been made by the *defendants*—that is, by the *trustees as a corporate body*—would have been of no practical use, for, in fact, no such contract has been proved. The writing signed at the October meeting of the committee is clearly not such. It was signed by five of the trustees, but only as individuals, in connection with others, and cannot be regarded as a corporate act. It was, at most, an agreement to submit the stipulations to the action of the congregation, and while evincing perhaps the views which the trustees individually held, whose right and province it was to give such a credit, and by whom such an agreement could be properly and efficaciously made, it could clearly form no basis for an action at law against the corporation, or any ground in equity on which specific performance could be enforced.

The committee meeting of October seems to me to have been one to inquire, consult, and advise. I can assign no higher authority or more binding obligation to the agreement then signed, than would belong to the suggestions or recommendations of a report. Those who signed it were not bound to adhere to the views it expressed, or to urge the congregation to adopt them, if, upon reflection or increased light, such views were perceived to be wrong. This being so, they were free to vote at the congregational meeting as they deemed to be right.

Much of the evidence and argument in the case was directed to the proceedings of that October meeting, and the complainant's claim discussed as if the trustees or corporation

as such, were sought to be bound by a contract then made. But it seems to me plain that the essential questions in the case relate to the meeting of November 13th, and to what was done in pursuance of it. This religious society is assumed to exist under the provisions of the general act, and presents, as was said by the Supreme Court of the state in *Miller* v. *Baptist Church of Allowaystown,* 1 *Harr.* 251, a threefold aspect. *First.* The congregation that usually meets together for religious worship and instruction; *secondly.* The church, strictly so called, composed of those entitled to full church privileges; and *lastly*, the trustees or corporation.

The president of the corporation refused to allow the credit voted by the congregation, and afterwards caused a prosecution at law to be commenced on the bond. The trustees, as individuals, differed in opinion as to the allowance of the credit, and took no action, as a body, respecting it, till some weeks after the prosecution was begun, when, at a meeting on the 16th of January, 1869, five of their number being present, the course of the president in that behalf was approved. The answer is sworn to by five of the trustees, but is not under the corporate seal, and does not appear to have been made by any vote of the trustees acting in their official or corporate capacity. It must now, however, be treated as if formally executed, and disposition made of the substantial merits of the controversy, as disclosed upon the whole case and discussed in the arguments.

It is insisted for the defendants that the congregational meeting of November 13th was irregular in its proceedings, and for that reason its action invalid; that the arrangement or agreement then adopted by which the pastor was to resign and $2000 to be allowed him was a *nudum pactum*, without consideration, and cannot be enforced; and *lastly*, that the congregation had no authority to make such a contract, if otherwise good; that the defendants are not bound by it, and this suit against them cannot be maintained.

The meeting was regularly called. The notice above recited was explicit and full in its terms, and is not denied to

have been properly published. The objects stated were to act upon the agreement of the October meeting, and in case of the pastor's resignation, to appoint commissioners to presbytery to carry it into effect. But it is said that considerable numbers were absent or did not vote; that the pastor was active in securing the attendance and votes of those favorable to himself; that he participated in the discussions of the meeting and denied the right of those who had signed the October agreement to vote against its stipulations, insisting that their votes should be counted in the affirmative, and they were accordingly so counted. Whatever may be thought of the complainant's conduct respecting that meeting on the score of propriety and taste, I can see no objection to it legally. By the permission of the meeting he was heard for himself. When the circumstances of his age, his long pastorate, and his pecuniary means, are considered, I can find nothing in his action to wonder at, certainly nothing to justify the appellation of fraud. In the idea that the signers of the October agreement were to be counted in the affirmative, he was wrong and had been wrongly advised, but the error made no important difference in the general vote. Three of such signers claimed to vote in the negative and were counted in the affirmative. If counted as they should have been, the vote would have stood sixty-six in favor, and sixteen or perhaps seventeen against.

Nor can it form any valid objection to the meeting that members of the congregation were absent, or, being present, did not vote. Where a society is composed of an indefinite number of persons, a majority of those who appear at a regular meeting constitute a body to transact business. The presumption is, that all the members present who observe silence when a question is put, concur with the majority of those who actually vote—that is, if the question be put audibly and explicitly. *Angell and Ames*, §§ 497, 499; *Miller* v. *English*, 1 *Zab.* 317.

Was the agreement to give the credit without *consideration*, and therefore void? The defendants insist that whatever

indebtedness existed to the complainant was adjusted and settled at the conveyance of the parsonage farm; that the $1000 then allowed was in full of all claims; that the further sum of $2000 was simply a gift, with nothing to stand on but the promise to resign, which promise they say was no equivalent for the credit and was insufficient to support it. The evidence is, that when the complainant purchased the farm, the $1000 was a jumping or compromise sum less than was believed to be due, and on the belief that he was to continue the pastor and not chargeable with interest on the mortgage. There is nothing in the transaction to bar the additional remuneration that was afterwards thought due. Had a clear duty existed to resign, a promise to do so for money would be called correctly a *nudum pactum*, or worse. But no such duty appears. A few wished him to do so, but the large majority not. On their part and on his part, it was a concession for the sake of harmony to the minority views. The pastoral relation is for religious and not mercenary ends, but the contract involved in it imposes pecuniary obligations and gives pecuniary rights which the law enforces and protects. I can see no reason why the surrender of those rights may not be lawful matter of pecuniary compensation whenever matter of pecuniary loss. That it was matter of loss, in this case, is plain. To meet it, and at the same time supply the deficiencies of the past, is, in my judgment, a very just and obvious foundation on which the agreement to give the credit of $2000 can stand. It appears from the proofs to have been conceded by all that *some* allowance should be made. The obligation to pay *something* does not seem to have been questioned, but only the amount. The *consideration* was not doubted, but the *measure* of it. This is shown by the discussions of the October meeting, by the testimony of the trustees, or some of them, now defending this suit, and by the terms of the protest to presbytery on the 9th of December. I am of opinion, therefore, that the promise of the congregation had a good and lawful consideration to support it; that there was no want of mutuality; and if the congregation had power to

bind the defendant corporation, the agreement having been performed on the one side, should be decreed to be performed on the other.

Had the congregation this power, or are the defendants in any wise bound? In Presbyterian societies the pastoral relation is established and discontinued not by the trustees or by the church, but by the congregation and the pastor, under the sanction of the presbytery. The call proceeds from the congregation, contains the agreement to pay the salary, and is subscribed by their elders and deacons, or by their trustees, or by a select committee, as the congregation shall appoint. It is presented to the minister only through the presbytery, and will not be effectuated without its approval. The authorities and controlling power of the congregation recognized in the book of government, is *exemplified* in the *practice* of these societies. The congregation direct the trustees. The former act as the substantial beneficial owners, the latter as the legal instruments to execute their will. This is shown by the defendants' book of minutes to have been the theory and the practice of the society, whose trustees they are. This construction, so long and generally acted on, was declared to be law by the Court of Appeals in the case of *Rose* v. *Morgan*, 7 *C. E. Green* 583. It was held in that case that the statute under which this society is formed creates only a simple trust, so that the trustees must hold and dispose of the property in conformity to the directions of their *cestui que trust*, who may be either the congregation or certain officials, according to the rules or discipline of the particular church or society. In the light of this decision, I can see no propriety or legal right in the attempt of the trustees, defendants in this case, to defeat the agreement entered into by the congregation, and especially after that agreement was sanctioned by the presbytery and acted on by the complainant. After the November meeting of the congregation, the trustees took no steps, as a body, to express their dissent, or make known their purpose, if such purpose they had, to resist the allowance of the credit.

In the case of *Miller* v. *Baptist Church*, 1 *Harr.* 251, it was held, in an action by the minister for his unpaid salary, that unless the trustees, as such, are parties to the contract, no action *at law* can be sustained against the corporation. But it was also held that when the society has regularly employed a pastor, it becomes the duty of the trustees to fulfill their trust by exerting the means in their hands to provide the stipulated support. And where their dissent does not expressly appear, it is to be presumed that they have undertaken to perform their duty. On these principles the action against the corporation in that case was sustained, though no express contract between it and the plaintiff was made out by the proofs. The same principles are applicable here. Having acquiesced in the action of that meeting, and allowed its consummation by the presbytery in the following month, and the removal of the pastor from his place on the faith of what was then agreed to be done, they cannot now thwart the wishes or deny the power of their *cestui que trust*.

I respectfully advise a decree in accordance with the prayer of the bill.