The complainant files its bill to restrain the breach of a contract.
On May 19th, 1924, the complainant entered into a contract with the defendant-corporation (which will hereinafter be called the manufacturer to distinguish it from the individual defendants). but which, upon its face, bears date the 24th of that month, wherein and whereby it was agreed, among other things, that the complainant would advertise and stimulate the sale of the manufacturer's product consisting of hair dye, and in return the manufacturer agreed to give an exclusive sales agency throughout almost the entire world to the complainant. The other defendants are two young men who have discovered a formula for making the hair dye mentioned and who operate through the manufacturer *Page 225 
as a close corporation. The bill sets forth that they had not been successful in establishing their business, and that this was the reason for the contract out of which this litigation grows. During a period of four months prior to the establishing of the relations by the parties, the manufacturer had sold, on an average, about five hundred boxes of hair dye per month. During the period in which the contract was in force the number of sales grew to an average of two thousand seven hundred and seventy-two per month. At the end of that period, or, to be exact, on April 7th, the manufacturer sent a letter to the complainant which, after notifying the latter that it had been guilty of various breaches, notified it that the contract was at an end. Since that time the manufacturer has been dealing directly with customers who previously dealt through the complainant. It has, by reason of saving the complainant's profit, quoted lower prices to those who were formerly the complainant's customers, and thus it is clear that if it continues to do so until final hearing, irreparable injury will result to the complainant if eventually successful in this suit, because it is self-evident that the latter cannot then expect its old customers to continue to purchase the manufacturer's hair dye at a higher price than they will have then been used to paying.
There are four points raised by the defendants which require particular attention — (1) that there was no mutuality, because the complainant had not been incorporated at the time the contract was executed by the two companies; (2) that the contract is inequitable, in that the complainant takes all and gives nothing; (3) because the complainant broke its contract prior to notice of cancellation by the manufacturer, and, therefore, does not come into court with clean hands, and (4) that it operates as an unreasonable restraint of trade.
I do not think it can be said that there was no corporation in existence when the contract was executed, the certificate being filed on April 21st, 1925. It is true that there was no corporation de jure, but sufficient had been done to establish one de facto. Three things only are necessary to establish the latter sort of corporation — first, a valid law under which such *Page 226 
a corporation might be incorporated; secondly, a bona fide
attempt to organize under such a law, and three, an actual exercise of the corporate powers. 7 R.C.L. 61. All of these elements were present. In addition, while the manual labor of executing the contract was performed just two days before the filing of the certificate of incorporation in the office of the secretary of state, the instrument was held in escrow by a member of the New York bar, as he swears, and the acknowledgment not taken until April 24th, the day after a certified copy was filed in the office of the county clerk of New York county, and not delivered to the parties until more than a month thereafter. So, that at the time of delivery and at the time of the taking of the acknowledgments, the complainant-corporation was complete, under the laws of the state of its domicile. So far as any irregularity in the taking of acknowledgment is concerned, contrary to the New York penal code, the punishment, therefore, may be left to the authorities of that state, but do not impair the validity of the instrument for the purpose of this motion.
Upon the argument, counsel for the defendants created some suspicion that the contract was so unilateral and devoid of consideration as to render it one that this court would refuse to enforce. A careful reading of the terms of the contract dispels this doubt. It is clear, as already said, that it appeared to the defendants as if increased revenues could be obtained by dividing the work of production from that of selling, and placing upon the shoulders of the complainant the latter labor. That this was so appears, I think, by a comparison of the sales made before and after the parties entered into this partnership. It is true that great powers were established for the benefit of the complainant, but, I think, not unreasonably so. The hair dye was manufactured under a secret process known only to the officers of the manufacturer, and, therefore, it was highly important to the complainant that no loophole should be left whereby the manufacturer might safely pass the secret information on to someone else and make the rights of the complainant nugatory in its contract. Complainant's attorney would have been grossly *Page 227 
derelict in his duty if he had failed to provide all reasonable safeguards against loss to a client who was embarking in a business dependent upon a commodity that could be produced by no one except the other party to the compact. It is pointed out on behalf of the defendants that the contract made it the duty of the manufacturer to deposit with a trustee or depository a copy of the secret process in a sealed envelope, with directions to the depository to deliver the same to the principal executive officer or manager of the manufacturer in the event of the absence from their place of business of both the inventors for a period of sixty days. This was clearly necessary if the business of the complainant was not to be terminated for lack of the commodity in which it dealt. It is also pointed out that the secret was to become the property of the complainant in the event of the manufacturer being adjudicated a bankrupt; having a receiver appointed of its property and assets; if an attachment, execution or other summary process should be issued against it and not vacated within three days by the filing of a proper bond, or if a judgment should be entered against it and remained unsatisfied for a period of ten days. Bearing in mind what I have already said, namely, that the complainant was dealing in a commodity which it was helpless to procure except from the manufacturer under this secret process, I do not feel that I can say that these conditions were unreasonable. Upon a complete reading of the instrument it appears to me to be a fair one, provided the manufacturer knew what it was signing. The bulk of the covenants are in favor of the complainant it is true, but the complainant, on the other hand, obligates itself enough to make it impossible for me to say that there is any such inadequacy of consideration as should shock the conscience of the chancellor, and especially when there is kept in mind the utter dependence of the complainant upon the integrity of the manufacturer.
Neither can it be said that the proofs of the manufacturer disclose a breach of the contract by the complainant prior to April 7th, 1925. The affidavits are not specific enough to meet the allegations of the bill and the replying affidavits. *Page 228 
And, in that connection, it should not be passed, without comment, that nearly all of the proofs submitted viciously disregard our rule against including in the affidavits arguments or reasons which are perfectly proper to be given by counsel on the argument of the motion. It is also true that many of the affidavits are couched in conclusions rather than facts. I realize that New York counsel, familiar with a different practice, have been engaged in the preparation for this motion, but that does not relieve the local solicitors of the responsibility of supervising these matters. To return to the lack of specific allegations, it is only necessary to point out that in the answering affidavit of the defendant Kirkpatrick, in which he says:
"Specific instances have been found in which the distributing corporation billed the product at $2.50 per box and received payment on these basis, and payment was made to the Paragon Laboratories, Incorporated, at the rate of $2 per box."
Not one word is said by him as to what these "specific instances" were or the source of his information concerning them. On the other hand, the replying affidavits most carefully point out the answers to certain alleged discrepancies described in the affidavit of the defendant Brown, and there are annexed to the same a tabulated statement of payments that completely overthrow the proofs of the defendant in this respect. I realize that I have not the full account before me, and that the final hearing may completely justify the defendants, but this is in the realm of conjecture, and counsel do not require to be told that I cannot decide the question at issue upon any such basis.
Lastly, is the objection that the contract is an unreasonable covenant in restraint of trade? If it was, that would be decisive. Mandeville v. Harman, 42 N.J. Eq. 185. But this is not a contract in restraint of trade. It is one creating an unlimited sales agency and is not illegal. Reeves v. DecorahFarmers Co-operative Society (Iowa), 140 N.W. Rep. 844. An unreasonable contract in restraint of trade is repugnant to the policy of our law because it stifles competition, and is *Page 229 
therefore injurious to the public. There is no combination here to prevent the sale, but, rather, to increase the sale of hair dye to the public, and neither is there anything to show a vicious effort to increase the price to the purchasing public. Nor am I prepared to say that hair dye is a matter of prime necessity or even so useful as to require great protection from the courts, although it has been earnestly argued that, under the prevailing mode, "hair has gone out and dye has come in."
In the decision whether to grant an interlocutory injunction or not, it should be remembered that "the sole object is to preserve the subject in controversy in its then condition." High Inj. §4. The court does not undertake to determine in advance the final disposition of the meritorious contest. The purpose of the writ, as distinguished from a perpetual injunction, is that it shall preserve the status quo pending final hearing. Ibid. §5a. In the present application the complainant has fairly made out its rights under the contracts of April 24th, 1924, and is entitled to have them preserved until the suit is concluded.
Some mention was made of an early date for the final hearing, but, upon further consideration, I have determined that there is no exigency that will require dispensing with the orderly steps in a cause. The parties have been operating under the contract for almost a year; it was entered into by persons sui juris and without any fraud, and a continuation of the relations for a short time further cannot be injurious. *Page 230