## Takach v. Molchany, Appellant.

Argued January 28, 1935. Before FRAZER, C. J., SIMPSON, KEPHART, SCHAFFER, MAXEY, DREW and LINN, JJ.

*John C. Sherriff,* of *Sherriff, Lindsay, Weis & Hutchinson,* for appellant.

*Thos. F. Garrahan,* with him *H. W. McIntosh,* for appellee.

OPINION BY MR. JUSTICE LINN, March 25, 1935:

This appeal is from a decree restraining appellant from acting as pastor of St. John's Greek Catholic Cathedral in the Borough of Munhall, Allegheny County. The decree was made at the instance of appellant's bishop, after hearing on amended bill, answer and voluminous testi-

mony. It is unnecessary to state in detail what is alleged in the pleadings. Appellant denied the power of the bishop to remove him and based his denial on an alleged contract said to have been made about the middle of the seventeenth century between representatives of the Roman Catholic Church and of the Ruthenian Greek Rite Church.

The particular church involved in this proceeding was established shortly before 1897. In that year, on the application of the parties interested, a charter for a corporation of the first class was granted by the Common Pleas of Allegheny County, with the corporate title "St. John's Greek Catholic Church of Homestead, Pa." Title to the church and other real estate was taken in the name of the corporation. In 1924, plaintiff was duly appointed by the Pope to be a bishop with ordinary jurisdiction over the Ruthenian Uniat Greek Catholic Church in the United States. In September of that year, the corporation requested the bishop to establish his episcopal seat at Munhall, and, to induce him to accept, agreed to convey to him, as bishop, and to his successors, land for his residence, agreed to enlarge the church, etc., etc. The bishop accepted the proposal and the conveyances were made. To accord with this change, the charter was amended. The name of the corporation was changed to St. John's Greek Catholic Cathedral. The purpose of the corporation was amended to read: "for the purpose of the support of public worship according to the forms, principles, doctrines and usages of the body of worshippers known as the 'Greek Catholics united with Rome,' and said corporation is subject to the regulations, rules, discipline and jurisdiction of the Greek Catholic Diocese of Pittsburgh, Pa." Another amendment provided: "The oversight and management of the business and temporal affairs of said corporation shall be vested in a Board of five Trustees, Right Reverend Basil Takach [plaintiff], Bishop of the Greek Catholic Diocese of Pittsburgh, or his lawful successor in office duly appointed by the Holy

Father, the Pope of Rome, and the Reverend Alexander Holosnyay, pastor of said St. John's Greek Catholic Cathedral, or his lawful successor in office, duly appointed by said Bishop of the Greek Catholic Diocese of Pittsburgh, or his successor or successors, appointed as aforesaid, shall be, by virtue of their offices, trustees of said corporation." Since 1900, the Reverend Holosnyay has been the pastor of the church.

Appellant was ordained to the priesthood in 1925 by the plaintiff, and, in the words of the chancellor, vowed "obedience to Pope Pius XI, the Pope of Rome, and to the complainant Bishop Basil Takach and their successors." The bishop then appointed him to the pastorate of a church at Warren, Ohio, where he remained until December, 1929, when the bishop appointed him pastor of the First Slavish Roman Catholic Greek Rite Church of Clairton, Pennsylvania.* In 1930, the bishop appointed him assistant pastor of his cathedral church in Munhall. About two months later, members of the church purported to elect him pastor. He set about performing the duties of the office, and thus necessarily attempted to exclude Reverend Holosnyay. In December, 1931, the plaintiff ordered the removal of appellant from the assistant pastorate of the cathedral church and appointed him pastor of St. George's Church at Aliquippa, Pennsylvania, another church under the bishop's jurisdiction. Defendant refused to recognize his bishop's power of removal and declined to refrain from attempting to act as pastor of the cathedral church, whereupon the plaintiff suspended him, and, as appellant remained recalcitrant, brought this proceeding. In his answer defendant asked affirmative relief against the plaintiff.

---

* There his installation was contested by a congregational faction, who resisted, until restrained from interfering with the installation; the court was of opinion that, as Reverend Molchany had been duly appointed by Bishop Takach, he must be accepted by the congregation (Powanda v. Pido, 304 Pa. 42, 155 A. 90).

It thus appears that, not only by his ordination, but also by his conduct over a period of years, appellant recognized the power of the bishop, and also the incapacity of members of a congregation to exclude the bishop's appointee.

After stating two reasons why the decree appealed from must be sustained, we shall indicate briefly why the contention made in attempted justification of appellant's conduct must be rejected.

1. By Papal decrees, contained in the record, it appears that plaintiff bishop is authorized to remove a pastor of any church under his jurisdiction for cause, with the right in the removed priest to appeal to established ecclesiastical tribunals against the removal. Appellant testified that he was familiar with these rights of appeal. His first duty, therefore, was to justify his challenged conduct before the tribunals provided by the government of his church for the review of his bishop's action. He gave no reason for rejecting them. Appellant may not ignore the conditions on which he held his sacred office and ask a secular court to substitute itself for the court designated by the church with which he is affiliated: Merman et al. v. St. Mary's Greek Catholic Church et al., 317 Pa. 33; German Reformed Church v. Seibert, 3 Pa. 282, 291; Furmanski v. Iwanowski, 265 Pa. 1, 5 et seq., 108 A. 27.

2. The bishop had power to remove appellant. This power is conferred by various Papal decrees, substantially to the same effect; the latest, under which plaintiff claimed to act, reads: "All rectors of parishes and missions of the Greek-Ruthenian in the United States are removable at the will of the Ordinary of the Greek-Ruthenian Rite, but they shall not be removed without grave and just causes," a phrase also translated, in the record, "without weighty and just reasons." As appellant undertook to exclude the existing pastor, his removal cannot be said to be without "grave and just causes."

We must reject what is urged in justification of appellant's conduct. He asserts that the bishop's action is

ultra vires; that the canon law and decrees of the Roman Catholic Church are not applicable to the appointment and removal of the pastor. In dealing with this contention, it is unnecessary to state at length the comprehensive historical position taken by the learned counsel for appellant. It is said that appellant's resistance of his bishop is justified by a contract, which he designates as the "Union of Ungvar," the "Pact of Union." Much of the record is devoted to this subject. No contract was proved. The evidence indicates a transaction, or series of transactions, originating in 1646, at Ungvar, in Hungary, and continuing for some years, by which certain Ruthenian Greek rite priests and their congregations, theretofore schismatic, or, perhaps, affiliated with the Greek Orthodox Church, were received back into the Roman Catholic Church. In receiving the Ruthenians, the Holy See allowed them to retain certain privileges theretofore enjoyed by them, though this record shows some dispute as to the exact scope of the privileges. No written "Pact of Union," or contract executed by both contracting parties, was produced at the trial; much of the testimony was opinion evidence by witnesses relying on historical references. In important particulars, the witnesses differed. The matter is of consequence here, only because appellant asserts that at that time the Ruthenian congregations reserved the perpetual right of selecting their pastors; that this privilege, so reserved in the seventeenth century, was brought with them to the United States in the nineteenth century and justified appellant's election by the congregation at Munhall. But appellant failed to establish the alleged right to elect priests not removable by the bishop for any cause whatever. The learned chancellor has found that this right was not reserved by the Ruthenian churches as a condition of their return to the Roman faith. There is evidence to support the finding and we give it effect.

Prima facie, a church "united with Rome" is subject to the canon law and decrees of the Roman Catholic

Church. The burden of proof that appellant is not governed thereby is on him, and the court below found that he had not sustained the burden. It is true that parts of the Codex Juris Canonici are not intended to apply to the Eastern or Oriental churches, a term which includes the Greek Catholic Churches united with Rome. This appears in the first canon which, in the record, is translated as follows: "Although in the code of canon law the discipline of the Oriental Church is often referred to, nevertheless, the code itself refers to the Latin Church only and does not bind the Oriental Church unless it deals with those matters which from the nature of the thing itself also affects the Oriental Church." The term "Oriental Church" includes the Ruthenian churches such as St. John's Greek Catholic Cathedral at Munhall. The learned chancellor held that the words "the nature of the thing itself," in the first canon, necessarily imported into the ecclesiastical polity of the Ruthenian churches united with Rome, canons 218 and 219, which were translated as follows: "(1) As the successor to the primacy of St. Peter, the Roman Pontiff has not only the primacy of honor, but also supreme and full power of jurisdiction over the universal Church, in matters of faith and morals as well as in those pertaining to the discipline and government of the Church throughout the whole world. (2) This power is episcopal, ordinary and immediate, and extends over each and every church, and over each and every pastor as well as over the faithful, and is independent of all human authority." "The Roman Pontiff, legitimately elected, obtains, from the moment he accepts the election, the full power of supreme jurisdiction by divine right."

It is, therefore, established by the record that, during the period involved, the provisions of the Codex Juris Canonici and Papal decrees, issued pursuant thereto, governed the right to appoint to, or remove from, the pastorate of the cathedral church at Munhall, and also provided a method by which appellant might appeal to an

ecclesiastical tribunal for review of his bishop's action. See generally, Powanda v. Pido, supra; Chrapko v. Kobasa, 271 Pa. 447, 114 A. 254; St. Mary's Immaculate Conception Greek Catholic Church's Petition, 296 Pa. 307, 310 et seq., 145 A. 862.

There was no abuse of discretion in declining to grant appellant's petition for rehearing.

The decree is affirmed at appellant's costs.