This is but an episode in the age-old controversy touching the worship of the true and living God which has resulted in the shedding of more blood since the beginning of time than any other single cause recorded in history. See Brewer, Historic Note Book691. All the passions and prejudices, hatreds and jealousies, which marked the Inquisition of Torquemada, the persecutions of John Knox and the slaughter of both Protestants and Catholics under Elizabeth are here present, although, fortunately, somewhat dormant.
The complainant claims to have been incorporated pursuant to the provisions of chapter 150 (P.L. 1914 p. 263; 2 Cum. Supp.Comp. Stat. p. 2974), which is an act entitled "A further supplement to an act entitled `An act to incorporate trustees of religious societies approved April 9th, 1875,' which supplement was approved April 9th, 1914." The defendants are twenty-six individuals, alleged to be members of the complainant corporation.
The bill alleges that the complainant was organized pursuant to the said supplement on November 7th, 1924, since which time it has been operating and functioning in the manner prescribed by the statute; that the corporate organization at the time of its incorporation consisted of the Right Reverend Basil Takach, appointed by the pope of Rome as bishop, and having supervision of Slav (Rusin) Catholics of the Greek Rite coming from Czecho-Slovakia, but formerly coming *Page 469 
from Hungary; the Reverend Theophil Zsatkovich, chancellor of said diocese, Reverend Alexander Papp, pastor of St. John the Baptist Greek Catholic Church of Perth Amboy, New Jersey, George Gengor and Alex. Horoschak, lay trustees, and that this organization continued at the time of the filing of the bill of complaint. The bill also alleges that the corporation is seized of valuable real and personal property; that on or about February 7th, 1932, the defendants held a meeting and decided to take over and usurp the control of the complainant, irregularly elected officers and trustees and assumed such control; that on March 5th, 1932, pursuant to notice, copy of which is attached to the bill, the defendants held a meeting to consider litigation to void the incorporation of the complainant; that at that meeting some of the officers and trustees irregularly chosen at the February meeting resigned, and the defendants attempted to elect others in their place and stead; that the officers and trustees so chosen by the defendants "announced that they would take over and usurp control of the complainant, its property, its dues and all other moneys belonging to the complainant;" that, since February 7th, 1932, the defendants have prevented complainant from taking up collections in the church and from collecting dues; have themselves collected such moneys and dues and appropriated the same to themselves, or to some account unknown to the complainant and not subject to its control, and that they have "endeavored to intimidate the pastor from performing his duties as trustee" of the complainant. An injunction is sought against the defendants to prevent a continuance of the acts complained of, and there is also a prayer for an accounting by the defendants.
To this bill the defendants filed an answer in lieu of plea and an answer and counter-claim. By the answer in lieu of plea the defendants deny the corporate existence of the complainant and deny that it has exercised, or is exercising, or that it is endowed with, any corporate functions.
The answer filed on behalf of the defendants and "such other members of the congregation and corporation, the Greek Catholic Congregation of St. John the Baptist as may *Page 470 
choose to come in" denies the corporate existence of the complainant, but admits the filing of a certificate in an attempt at incorporation pursuant to the provisions of chapter 150 (P.L.1914), and it denies that complainant is either a corporationde jure or de facto, and denies that it has ever exercised any corporate franchises or done or performed any acts or business as a body corporate or otherwise. The answer also denies the alleged usurpation of the functions of the complainant and denies all charges that defendants have illegally elected officers and trustees of the complainant, but it alleges that the defendants are the duly elected trustees and officers of the Greek Catholic Congregation of St. John the Baptist, not the complainant body, but a corporation duly organized and existing under the laws of the State of New Jersey, and that since February 7th, 1932, they have acted as such trustees and officers and that they have not at any time assumed or exercised any of the alleged franchises or corporate powers of the complainant. The answer also denies that the complainant is seized or possessed of any property, real or personal, and, by way of counter-claim, the defendants in their own behalf and in behalf of "such other members of the congregation and corporation, the Greek Catholic Congregation of St. John the Baptist as may choose to come in," allege that on September 13th, 1897, the defendant Deliman and six other individuals named, "being a congregation of Christians entitled to protection in the free use of their religion by the constitution of this state, assembled in their place of worship for the purpose of electing trustees and becoming incorporated * * * and * * * when so assembled, did elect" certain trustees and became incorporated pursuant to "An act to incorporate trustees of religious societies," Revision of 1877, and the supplements thereto and amendments thereof under the name of "Greek Catholic Congregation Annunciation of St. Mary;" and that the certificate of incorporation was filed in the office of the clerk of Middlesex county on September 14th, 1897, as required by the statute; that on May 19th, 1901, by appropriate corporate action, the name of that corporation was changed to *Page 471 
"Greek Catholic Congregation of St. John the Baptist" and that that corporation has continuously functioned from the date of its incorporation until the present day, during which period it has acquired real and personal property of a value in excess of $250,000; that the congregation has a present membership of more than one thousand persons; that the officers and trustees of said congregation were annually elected, sworn into office and performed their respective duties from the date of incorporation down to the year 1932, when, after the election on February 7th, 1932, the then pastor, Michael E. Lukats, refused to administer the oath of office and refused to induct them into office, without assigning any reason therefor, whereupon they were sworn in by a master in chancery of New Jersey. Counter-charges of attempted usurpation of control of the church organization and property by the complainant, the bishop, his chancellor, the pastor and other individuals are made; and it is further charged that the alleged incorporation of the complainant is void because of non-compliance with legal requirements, and because of fraud practiced by the bishop, his chancellor, the pastor and the other named individuals upon the members of the Greek Catholic Congregation of St. John the Baptist; that the consent to the incorporation of the complainant under the provisions of chapter 150 (P.L. 1914), was obtained by fraud and that the complainants have attempted to unlawfully interfere with the defendants in the performance of their respective functions as trustees and officers of the Greek Catholic Congregation of St. John the Baptist. It is also charged in the counter-claim that the act under which complainant claims to have been incorporated is unconstitutional, for reasons to be hereinafter stated, and that, therefore, the complainant has no legal corporate existence; and an injunction and an accounting are sought against the complainant and the individuals named in the counter-claim.
Upon the filing of the bill of complaint an order to show cause with temporary restraint as prayed for was issued against the defendants, but on the return of that order the restraint thereby imposed was vacated and the complainant and *Page 472 
the individuals named in the counter-claim were restrained from interfering with the defendants in the performance of their duties as officers and trustees, as it then appeared that these officers and trustees, and their predecessors in office, had continuously functioned as such since the original incorporation in 1897; and they were permitted to continue to so function, with certain restrictions imposed by the court and consented to by counsel, pendente lite.
If the sole question here were which of two groups of men constituted the lawful board of trustees of a religious society, this court would lack jurisdiction, the proper procedure for inquiring into the right of office being by quo warranto.Schilstra v. Van Den Heuval, 82 N.J. Eq. 612. But that is not the issue. Two opposing groups assert the right to office of trustees, not of the same, but of different corporate entities, each of which corporate organizations claims title to, and the right to the control of, valuable real and personal property. The corporate existence of each is challenged by the other, the protection of valuable property rights and relief from the effects of fraud is sought. These are proper subjects of inquiry by this court even though their consideration incidently involves the determination of the right of office.
The answer in lieu of plea raises all the defenses interposed by the answer, except that of laches, and it need not be separately considered.
The issues presented by the pleadings are as follows:
1. The existence, either de jure or de facto, of the complainant as a corporate entity. Defendants deny such corporate existence because of
(a) The unconstitutionality of chapter 150, P.L. 1914.
(b) Defective procedure.
(c) Lack of a necessary incorporator.
2. Laches.
3. Fraud in incorporation under the 1914 act and in obtaining consent thereto.
The real controversy here is whether the temporal affairs of the church congregation involved, including the properties, *Page 473 
real and personal, shall be controlled by the bishop of this diocese alone, through a board of trustees consisting of himself, his chancellor, the local priest (both of whom are appointed by him) and two lay trustees selected by these three, or shall be controlled by the parishioners through a board of trustees chosen by themselves.
 1. (a) THE CONSTITUTIONAL QUESTION
Of course, the complainant must be a corporation either dejure or de facto or it has no legal capacity to sue or be sued. Martin v. Deetz, 102 Cal. 55. A corporation de jure
is one having a legal right to exist, and it cannot exist dejure unless it exists in fact and by legislative authority.Id. To establish a corporation de facto, three things are necessary. 1. A valid law under which such a corporation might be incorporated. 2. A bona fide attempt to organize under such law; and 3. An actual exercise of the corporate powers. ParagonDistributing Corp. v. Paragon Laboratories, Inc., 99 N.J. Eq. 224; 7 R.C.L. 61.
While in National Docks Railway Co. v. Central Railroad Co.,32 N.J. Eq. 755, it was held that the court of chancery would not, on a motion for preliminary injunction, inquire into the dejure existence of the complainant company so long as it had complied with all formal requirements, and was a corporation defacto, in Sisters of Charity of St. Elizabeth v. MorrisRailroad Co., 84 N.J. Law 310, it was held that where the right of eminent domain depended upon the constitutionality of the act under which the claimed right was exercised, "the court would not stay its hand because its decision incidentally involves the very right of the corporation to exist."
The complainant claims to have succeeded, by operation of law, to all * * * the property of another corporation, the Greek Catholic Congregation of St. John the Baptist, held in trust for the defendants and others, who deny both the succession and right thereto; and the existence of a valid law *Page 474 
under which the complainant corporation could be organized, the first requisite of a de facto corporation, is challenged.
I have no doubt, under the circumstances, of this court's power to determine either complainant's de jure or de facto
existence.
The constitutionality of chapter 150 (P.L. 1914), will be now considered. If the act falls, the complainant falls with it, because it is under that act that complainant claims existence. An analysis of the act is appropriate. (In the ensuing analysis the italics are mine.)
The act is entitled "A further supplement to an act entitled `An act to incorporate trustees of religious societies,' approved April ninth, one thousand eight hundred and seventy-five."
Section 1 provides that it shall be lawful for any Ruthenian Catholic Church or congregation now existing, or which may hereafter exist in this state, to become a corporation under the provisions thereof.
Section 2 provides that "the Catholic bishop appointed by the pope of Rome to have supervision of Ruthenian Catholics of the Greek rite in the United States, together with his secretary or chancellor, and the pastor of such Ruthenian Greek Catholic Church for the time being, or a majority of them, may elect two lay members of such church or congregation and may, with said laymen, sign a certificate, setting forth the name by which they and their successors shall be known, and file such certificate with the clerk of the court of common pleas of the county in which such church or congregation may be located, and thereuponsuch church or congregation shall become a body corporate by the name or title so taken, certified and recorded."
Section 3 provides that the persons so executing said certificate shall be the trustees of such corporation and they and their successors shall by such name have power to acquire property, sell and dispose of the same, to sue and be sued, to make and use a common seal, to have perpetual succession, to make by-laws, to borrow money, execute mortgages and to have the management and control of all civil and temporal *Page 475 
affairs of the congregation, and to exercise all necessary powers.
Section 4 provides for the perpetuation of the succession through the successors in office for the time being of the Ruthenian Greek Catholic church through the "Ruthenian Greek Catholic bishop in communion with the Roman See and appointed by the pope of Rome," his secretary or chancellor, and the pastor and the two lay members who are to be appointed annually by the bishop, his chancellor and the pastor.
Section 5 provides that the bishop so appointed shall be, exofficio, president of such board of trustees.
Section 6 provides that the acts of the majority of the board shall be valid providing the same receive the written sanctionof approval of the bishop.
Section 7 provides for the continuance of the corporation notwithstanding the failure thereafter to elect trustees.
Section 8 provides that any religious organizationincorporated under any law of this state may organize under theact by the filing of the required certificate "together with acertificate signed by the trustees of such existing associationor organization or a majority of them consenting" thereto, and that upon the filing of such certificate and consent "all theright, title and interest of such association or corporation inany estate, real or personal, with all franchises and charterrights, be vested in said body corporate and politic so createdunder this supplement, and the original incorporation of suchassociation so organized shall be null and void."
Substantially, the provisions of the 1914 supplement are the same as those contained in the act providing for the incorporation of Roman Catholic congregations. 3 Comp. Stat. pp.4327 et seq. Such a congregation has no control over "its affairs" or "its property;" the bishop, acting through his trustees, is supreme. 3 Comp. Stat. p. 4328 § 43 and P.L.1900 ch. 159 p. 400. As applied to Roman Catholics there is no impropriety in this time-honored custom; but these parishioners are not Roman Catholics and could not, in the first instance, have incorporated under that act. (Section 45 *Page 476 
(3 Comp. Stat. p. 4328), if valid, applies only toincorporated religious associations.) They chose to become incorporated under an act which insured the control of their temporal affairs by the parishioners themselves and which protected their properties from alienation without their consent; and the corporation thus formed was existing and functioning pursuant to the authority of that act at the time of the attempted incorporation under the 1914 supplement in 1924. Under the General act the legal title to all ecclesiastical property was vested in the trustee who held it in trust for the benefit of the congregation. Morgan v. Rose (Court of Errors andAppeals, 1871), 22 N.J. Eq. 583. In that case it was held that "the temporalities of the church are put in trust, without limitation, for the use of the congregation" and that "the trustee is a mere depositary of the property and * * * thecestui que trust had both the jus habendi, or the right to be put in the actual possession of the estate, and the jusdisponendi, or the right to call upon the trustee to execute conveyances of the legal estate, as the cestui que trust
directs." Also that "the trustees * * * have no rights, in equity, to control or dispose of the church property except as directed so to do by the cestui que trust." See, also,Worrell v. First Presbyterian Church, 23 N.J. Eq. 96; Page v.Asbury Methodist Episcopal Church, 78 N.J. Eq. 114, and Grupe
v. Rudisill, 101 N.J. Eq. 145. In the latter case it was held that "the purpose of providing for the incorporation of trustees of religious societies was not to deprive the congregation of the right to control church property but to transmit it in perpetual succession."
It is both interesting and helpful to contrast the provisions of the General act with those of the 1914 supplement. Under the General act the trustees are constituted a body corporate (section 1); under the supplement the congregation, and not the trustees, is the body corporate (section 1). Under the General act the trustees, in the name of the corporation, may acquire and dispose of property (section 3); but their power in this respect is restricted. They simply hold the legal title to such property subject to the will of the *Page 477 cestuis que trustent. (Morgan v. Rose, and other cases cited, supra.) Under the supplement the trustees have complete power to acquire and dispose of property and have the complete management, direction and control of all the civil and temporal affairs of the congregation, unrestricted by the will of the congregation. (Section 3.) Under the General act the trustees are selected by the members of the congregation (section 4). Under the supplement the trustees (section 2) consist of (1) the Catholic bishop appointed by the pope of Rome to have supervision over the Ruthenian Catholics of the Greek rite in the United States; (2) the secretary or chancellor of such bishop; (3) the pastor of such Ruthenian Greek Catholic church for the time being; (4) and (5) two lay members of the church or congregation to be chosen by the first three. Thus the majority of the trustees, who are given, by the act, absolute control over the temporal affairs of the church, will consist of three men not members of the congregation and under the control of the pope. And the acts of the trustees are valid only when approved in writing by the bishop, thus vesting complete and absolute control in one individual — a result quite contrary to the evident intent of the congregation when it chose to incorporate under the General act. Certainly so radical a change in government or policy ought not to be made without the consent of the parishioners themselves, but no such consent is required by the act. And it should be noted that the supplement authorizes three individuals, not members of the particular congregation, to select two members thereof, which five constitute a new corporate entity in the incorporation and organization of which the membership of the congregation have no voice, but which, nevertheless, by "operation of law," so it is claimed, succeeds to all the property of the particular congregation.
Although section 1 provides for the incorporation, under this act of "any Ruthenian Catholic church or congregation," section 8 says that "any religious organization * * * incorporated underand by virtue of any law of this state" is authorized to organize under this act. It then provides that upon the filing of a certificate according to the same *Page 478 
(presumably the one referred to in section 2) together with a certificate signed by a majority of the trustees of the existing organization, consenting to such incorporation, all property rights of every sort "shall * * * be vested" in the new corporation "and the original incorporation of such association or organization, shall then be null and void." Thus the transmission of property from one corporate entity to another is accomplished without any corporate action of the one, and without the consent of the cestuis que trustent for whose benefit such property is held, in direct violation of their rights as previously adjudicated by the courts of this state. Morgan v.Rose, supra. And the old corporate entity is ipso facto
dissolved without any proceedings whatever to that end. Such a legislative dissolution may be permissible under the reserved power of the legislature (General Corporation act, section 4; 2Comp. Stat. p. 1600; State v. Commissioner of RailroadTaxation, 37 N.J. Law 228, 237; Shiloh Turnpike Co. v. Bates,80 N.J. Law 171, 174); but the legislature does not have the power to thus transfer the property of one corporation to another. Coster v. The Tidewater Co., 18 N.J. Eq. 54;affirmed, Idem. 518; Addoms v. Marx, 50 N.J. Law 253.
The constitutionality of the act must be judged by its language, by what it authorizes or by what may be done under its purported authority. Stuart v. Palmer, 74 N.Y. 183;Gilman v. Tucker, 128 N.Y. 190. We have then, under this act, the possibility of, and authority for a situation such as this to develop:
A corporation is in lawful existence under the General act, with the means of perpetuating that existence indefinitely. The trustees, as the body corporate, cannot dispose of the church's property except in accordance with the will of the congregation as a whole. That congregation may be orthodox, Baptist, Methodist, Presbyterian or what not, so long as it exists as a corporate entity. The pope of Rome, who, up to now, has no control over the temporal affairs of this church, appoints his bishop to supervise the Ruthenian Greek Catholics. His secretary is selected. These two (who *Page 479 
naturally will act as one) with the pastor of the church, select two lay members of the congregation. Since all are virtually appointees of the bishop, actual control is centered in him. Upon the filing of a proper certificate by these five, a new corporation comes into being. Then, upon the mere signing of an assent to the plan by a majority of the trustees of the old corporation, acting individually, if they choose to do so, the latter passes out of existence entirely and all its property vests in the new organization, subject to the control of the five trustees alone. And all this may happen without a vote of the members of the congregation, even without their knowledge. The action of the old trustees need not be taken in formal meeting. Their signatures may be obtained without deliberation, without notice of any kind to, or authority from, the cestuis quetrustent whose vested rights in the charter and in the other property of the church, be it Protestant or Catholic, are thus transferred "by operation of law" to the control of a new corporate entity dominated by the bishop.
The fourteenth amendment to the federal constitution prohibits the taking of property "without due process of law." "The legislature is not vested with the power to arbitrarily provide that any procedure it may choose to declare such shall be regarded as due process of law. If it possessed that power, the guaranties of the constitution would be rendered unavailing and private rights of citizens would be within its absolute control."Colon v. Lisk (Court of Appeals of New York, 1897),153 N.Y. 188; 47 N.E. Rep. 302.
"The legislature has no power * * * to transfer to one man the property of another, without his consent, either with or without compensation. This want of power does not depend upon any constitutional restriction, but upon the fact that it is not the exercise of the power of making laws, or rules of civil conduct, which is the branch of sovereign power committed to the legislature." Coster v. The Tidewater Co., supra. The same rule applies to private corporations.
"The grant to one of the power to manage and improve the property of another, without his consent, and contrary to his judgment, even if exclusively for his benefit, is an infringement on the right of acquiring, possessing and enjoying *Page 480 
property guaranteed to every one by the constitution." Ibid.
The decree in this case was affirmed (18 N.J. Eq. 518,
opinion by Chief-Justice Beasley), on the theory that the statute involved permitted the taking of private property for public use without due compensation. And the chief-justice said: "The legislative power is not competent to take the property of A and transfer it to B, simply for the benefit or convenience of B, because such an act has no public aspect; it concerns and affects, exclusively, the two individuals. In such case, itwould be within the authority of the judiciary to pronounce suchtransfer unconstitutional and void." (Page 523.) (Italics mine.) And in Addoms v. Marx, supra, the same distinguished jurist said: "In this commonwealth no vested right of property can be alienated or impaired except in one of two modes * * *, first, by the consent of the possessor of such right; or, second, by a legislative appropriation to a public use and upon compensation rendered." No "public use" was in legislative contemplation when this supplement was enacted, and only private rights in property are affected by it. It is subtle legislation and a clear attempt to take the property of one private corporation and transfer it to another such corporation without the consent of the one. This is not "due process of law;" and the ultimate result which may be attained through this "process" cannot be appreciated without a study of the provisions of chapter 62 (P.L. 1918), an act not referred to in the briefs of either counsel. I deem it my duty to declare chapter 150 (P.L. 1914) unconstitutional and void. A corporate complainant existing in name only, without legal sanction, is powerless to sue or to be sued, and a bill filed in such name should be dismissed.
Having so determined, it might seem unnecessary for me to consider this controversy further; but I have deemed it best to consider the other points at issue as well.
 (b) DEFECTIVE PROCEDURE
The irregularities touching the meeting at which the incorporation of complainant was attempted, and which the defendants claim rendered the attempt abortive, are as follows: *Page 481 
1. Notice. The May meeting had been called pursuant to notice announced in church for three successive Sundays prior thereto according to custom (the church organization was ruled by custom, no by-laws having ever been adopted. Vargo v. Vajo, 76 N.J. Eq. 161). The September meeting was announced in church, to be held in the parish house for three P.M. on the following Sunday, and on that day it was announced that the meeting would be held immediately after twelve o'clock mass, and it was so held. That notice must be uniform and to all entitled to it, see Schilstra
v. Van Den Heuval, 82 N.J. Eq. 155.
2. Presiding Officer. The Reverend Papp presided at the meeting, excluded the president of the congregation, Deliman, who was refused permission to preside and forced to sit at a table on the floor and not on the platform. It needs no citation of authorities to brand this action as illegal. Father Papp claimed the right to preside under the canon law, but did not produce his authority at the final hearing, although given an opportunity to do so.
3. Roll Call. There was no roll call of the members present, no record made of those who were present, and no record produced showing those entitled to vote. The number of parishioners present at the meeting is uncertain, but it has been variously estimated at from three hundred to six hundred and fifty. The "Menoslov," a list of those entitled to vote at congregational meetings, was in the possession of the pastor, but not produced. This was irregular, to say the least. It is claimed that the "Vykaz" for 1923, prepared, edited, printed and distributed by the Reverend Papp, showed only four hundred and eighty-eight persons entitled to vote.
4. Discussion. Many of the parishioners were denied the privilege of the floor. The evidence on this point is in conflict, but the weight of it is with the defendants. It indicates that the pastor permitted full discussion by those favorable to his proposal, but denied the privilege to many who were opposed. At least one objector who arose and sought the floor to speak was told by a "gendarme" to sit down.
5. Illegal Voting. Women and children not entitled to *Page 482 
vote were permitted to vote on the questions submitted. Under the Religious Society act (3 Comp. Stat. p. 4307 § 1) the persons eligible to form a religious society must be over twenty-one years of age, and "contribute to the support" of "the congregation;" but under the custom of this church only married men over twenty-one who contributed $12 per annum, widows and single persons, male and female, over twenty-one, and who contributed $6 per annum, were entitled to attend and vote at a parochial meeting. Married women were entitled neither to attend nor vote. The evidence that married women and both males and females under age attended and voted at this meeting is overwhelming.
6. Intimidation. The meeting was policed on the inside by officers and detectives in plain clothes, but known to the parishioners to be officers of the law; and on the outside by policemen in uniform, whereby actual intimidation of the parishioners is alleged to have been accomplished. There is no doubt of what prompted the priest to arrange for the services of these officers, or that he did so. The May meeting had broken up in a riot when its object was discovered. The presence of these officers was alarming, to say the least, as witness the concern of Danilovic, one of the parishioners, who, observing the officers, inquired of Father Papp: "What do you think this is, Budapest, or what?" It is argued, and with some force, that to this foreign-born assemblage, the "gendarmes" in uniform were emblematical of the tyranny of the homeland from which they had migrated, and, being law-abiding citizens, they became fearful, in the presence of these officers, that by some unguarded act they would become enmeshed in the law; that they were thus intimidated and, by Father Papp, intended so to be, to facilitate his domination of the meeting then in progress.
There was evidence that the parishioners were "more or less dazed and afraid" * * * "the cops scared the people from it" * * * "scared them to keep silent and keep order." There is no doubt as to the existence of all these irregularities in connection with the meeting at which the attempt to incorporate under the 1914 act was had, and it is *Page 483 
quite probable that they are sufficient to spell its illegality (Dickson v. Wilson, 21 S.W. Rep. 2d 1072); but they may all be considered as part and parcel of the alleged fraud and I prefer to consider them in that connection.
 (c) LACK OF A NECESSARY INCORPORATOR
The defendants, in addition to other matters urged in defense and in support of their counter-claim, allege that Bishop Takach is not "the bishop" named in the supplement and that therefore the complainant's certificate of incorporation lacks a necessary incorporator; that the act contemplated a Catholic bishop having supervision of Ruthenian Catholics in the United States; that the Reverend Takach claims to be a bishop of a part of "Slav [Rusin]" Catholics coming from Hungary, but that as a matter of fact he is titular bishop of Zela, according to his certificate of appointment, and that there is no evidence that he is "the
Catholic bishop appointed by the pope of Rome to have supervision over Ruthenian Catholics" of the Greek rite in the United States; that if he is a bishop at all, he is a bishop of Ruthenian Catholics and not of Slav or Rusin Catholics.
Defendants claim further that in 1914 there was no bishop in the United States who could qualify under this act as incorporator, but that in 1924 there were two persons claiming that office and that proof that either of the two was in fact a bishop, or, if a bishop, of what his diocese consisted, is wholly lacking. In St. Mary's Greek Catholic Church of Johnstown,Pennsylvania, v. Buchovocky (Cambria County, Pa.), 6Cambria County Reports 137, and in Rt. Rev. Basil Takach v.Molchany (Allegheny County, Pa), affirmed, 318 Pa. 65;177 Atl. Rep. 697, it was assumed or admitted that the Reverend Takach was the duly appointed bishop having jurisdiction over Catholics of the Greek rite, but they are neither authoritative nor dispositive of the question.
It is unnecessary, in the view I take of the matter, to decide this vexing question, but it should be noted that according to recognized authority (Catholic Encyclopaedia, Vol VI, pages 744-746; Shipman Memorial, 188-190), *Page 484 
the word "Ruthenian" as used in Catholicism comprehends not only the Ruthenians proper but also Slovaks of northern and northwestern Hungary, the Bohemians of Austria, the Rusins or Little Russians, and all those nationalities of the Carpathian mountain district who are Greek Catholics ascontra-distinguished from Russians and others of the Greek orthodox faith." (Here follows a quotation from cited authorities explanatory of the word "Ruthenian;" it is omitted from this report by direction of the court.)
And it may well be argued that this congregation has recognized the Reverend Takach as bishop by accepting a priest of his appointment and by other acts and is therefore estopped to deny his authority.
 2. LACHES
By the complainants, the delay on the part of the defendants for a period of eight years, from 1924 to 1932, in attacking the incorporation under the 1914 act is charged as laches.
By the defendants, the alleged delay by the complainant for the same period in completing its organization and exercising its franchises, is charged as laches; and it is also contended that this delay deprives the complainant of one of the necessary elements of its de facto existence.
As to complainant's contention, the delay of the defendants is satisfactorily explained by the fact that the old officers and trustees, and their successors, annually elected, continued to function as theretofore, a circumstance calculated to allay all fears that the congregation was not still supreme in temporal affairs, a result definitely sought by Father Papp whose position of trust and confidence demanded the full disclosure which he withheld.
In view of my conclusion that the act of 1914 is unconstitutional, it is unnecessary to consider the effect of the delay charged against the complainants.
 3. FRAUD
Before considering the alleged fraud which the defendants claim invalidates the attempt to dissolve the old church *Page 485 
organization and transfer its properties to the new corporate entity, and in order that there may be a clear and complete understanding of this controversy, some inquiry into the background of the parties to it, including the entire membership of the church congregation, their nationality, origin and history, their education or the lack thereof, and their political and social outlook, must be made, as these all have a bearing upon the attitude of the respective parties, and account for the passions and prejudices which are predominantly evident.
These parishioners, although a composite of numerous nationals, are in the main of Slavonic origin. They call themselves "Slovaks" and most of them originated in lower Russia and northern Austria-Hungary, and from the northern and southern slopes of the Carpathian mountains. They are not Roman Catholics, but are Catholics of the Eastern or Greek rite, although reunited with the church of Rome in spiritual matters and are known as "Uniates." Some knowledge of church history with which they are identified is essential to an understanding of their attitude in this controversy. (Here follows an extended discussion of church history which is omitted from this report by direction of the court.)
With this background we may now consider the issue of fraud and the evidence bearing thereon offered at the final hearing, which was quite protracted, and during which over two thousand three hundred pages of testimony were transcribed.
For the sake of clarity, the following chronological statement should be made:
On September 14th, 1897, the "Greek Catholic Congregation Annunciation of St. Mary" was incorporated under the General Religious Societies act of 1875.
On May 21st, 1901, the corporate name was changed to "Greek Catholic Congregation of St. John the Baptist."
On November 7th, 1924, the incorporation of the complainant pursuant to chapter 150 (P.L. 1914), and under the name of "St. John the Baptist Greek Catholic Church of Perth Amboy, New Jersey," was attempted. The exact date of this alleged incorporation is in doubt, the minutes fixing *Page 486 
the date of the meeting at which it is said to have been authorized on September 28th, 1924; but it is unimportant for the purposes of this opinion.
The undisputed facts as developed at the final hearing show the incorporation of "Greek Catholic Congregation Annunciation of St. Mary's;" the change of its corporate name to "Greek Catholic Congregation of St. John the Baptist" as above recited; and that from the original incorporation in 1897 down to 1924 its temporal affairs were conducted by the duly elected officers and trustees, except that on September 9th, 1923, at the request of the Reverend Papp, the then pastor, the parishioners granted him the right to sign checks as pastor with the other duly authorized officers. (This permission was revoked on February 7th, 1932.) The enactment of chapter 150 (P.L. 1914) was procured by Bishop Ortynsky apparently in pursuance of the policy of the church of Rome to Latinize all churches under its jurisdiction. Previously, it is claimed, attempts were made by the then Roman Catholic bishop having spiritual jurisdiction over this church society, to obtain control of its temporal affairs also, but without success. The exact nature of these attempts is not indicated, but the desire for such control is not disputed, nor is the refusal of the parishioners to submit in dispute. The affairs of the church organization and the relation of the parishioners and the officers and trustees were entirely harmonious until shortly after the advent of the Reverend Alexander Papp as pastor in September, 1923. Immediately after his arrival he took steps to accomplish the incorporation of this congregation pursuant to the provisions of the 1914 supplement. He investigated the status of the corporation, consulted counsel (not the solicitor of the defendants, who had acted as counsel for the church for many years, is of Slavic origin, and an accomplished linguist, and who acted as court interpreter in his county for many years, but a lawyer of the Roman Catholic faith, withal a man of unquestioned integrity, high standing and ability, but who speaks and understands only the English language), and began a campaign designed to accomplish his purpose, and, in May, 1924, he called a meeting of the parishioners to act upon the proposed incorporation. He advised *Page 487 
them that their charter had been forfeited and that it was necessary to have a new charter. When the parishioners learned that by incorporation under the 1914 supplement the control of their temporal affairs would be taken from them and vested in the bishop of the diocese, the meeting broke up in a riot. There are no minutes of that meeting. After that meeting and until September, 1924, when (according to the minutes) a second meeting of the parishioners was called, an intensive campaign for incorporation under the 1914 supplement was instituted and carried on by the Reverend Papp and many members of the church organization acting with him and under his direction. Much labor was expended and much missionary work done to allay the fears of the members of the congregation, aroused at the May meeting, that they would be deprived of the control of their temporal affairs. The action which the complainant alleges resulted in its incorporation and the transfer of the church property from the old organization to the new, and which the defendants claim was entirely abortive, took place at that meeting. Its effect will now be considered. It may be noted at this point that the 1914 act requires no meeting of the parishioners, or in fact anycorporate action whatever on the part of the existing corporation.
The fraud alleged to have been perpetrated in the attempted incorporation consisted of misrepresentations by the pastor and those associated with him as to the necessity of incorporation under the 1914 act, the adoption of a new charter, and as to the effect thereof. It is claimed, and I think the contention is amply supported by the evidence, that prior to the September meeting the pastor of the church had repeatedly stated to his parishioners, both personally and through his representatives, that the charter of the church had been forfeited; that it had been lost; that it was unfit for a church organization; that it was similar to a Salvation Army charter or that of a beneficial society; that it was not a real church charter; that under it there was no guarantee that the parishioners would adhere to the Greek Catholic faith; and that by a majority vote they could at any time become orthodox and call a non-Catholic pastor; that it was necessary, *Page 488 
in order to accomplish the recognition of the bishop of the parishioners' own flesh and blood, who was about to come to America from Europe, that the charter be amended; that without such amendment the bishop would be displeased; that the proposed amendment or incorporation under the 1914 act concerned merely the spiritual affairs of the congregation; that it would in nowise interfere with the continued management and supervision of their temporal affairs as theretofore, and that under the existing charter the congregation was existing the same "as if a man lives with a woman `na viru,'" or without being married properly. It is also claimed that the consent to the incorporation of the complainant was obtained by means of the same fraud.
It is a fact that at the meeting said to have been held in September, 1924, a large majority of those who voted, voted in favor of the question submitted, but there is some doubt as to just what the question was. The complainant claims that a resolution authorizing its incorporation was adopted but no such resolution appears in the minutes of the meeting nor is any copy produced. The question which was submitted is said to have been referred to either as whether they should have a new charter, or recognize the bishop. "Recognize the bishop of your own flesh and blood" was undoubtedly the watchword. The serious question in connection with this meeting is whether or not the parishioners at that time realized what they were doing, or whether they were not induced by misrepresentations to do what they would not have done had they understood its legal effect. It is a fact that after this meeting and the action there taken, the then officers and trustees of the congregation continued to function as theretofore until the next annual election; that annually thereafter seven trustees were elected by the parishioners as had been the custom in the past; that they were sworn and inducted into office by the pastor as theretofore down to the time of the annual election in 1932, and that during all that period there was no appreciable change in the conduct or control of the temporal affairs of the congregation.
It is true that the minutes of the annual meeting for 1927, *Page 489 
which were in the Reverend Papp's handwriting, refer to two of the trustees as "curator trustees," but in actual practice there was no distinction between those trustees and the remaining five who were designated simply as "trustees;" and the evidence is to the effect that the word "curator" is the Slavonic equivalent of "trustee."
The evidence touching the question of fraud is conflicting and is due mainly, I believe, to the different conceptions of the respective witnesses as to what constitutes fraud. As to the actual facts touching the proceeding incident to the attempted incorporation, a majority of the witnesses on both sides of this controversy are in substantial agreement and the facts thus proved overwhelmingly indicate, in my judgment, not only a fraudulent purpose but the actual accomplishment of that purpose by fraud. Except for the testimony of Mr. Toolan, who testified on behalf of the complainants, I should not have the slightest hesitancy in branding this whole transaction, from its very inception to its consummation, as fraudulent. Mr. Toolan is the lawyer consulted by the Reverend Papp immediately after he assumed his pastorate of this congregation in 1923 and he says that the Reverend Papp consulted him to determine what steps were "necessary to bring the church and the properties of that Greek church under the jurisdiction of the pope at Rome and to determine what steps would be necessary to transfer title to all of the assets of the church, as then constituted, to the new order." The purpose of the proposed incorporation is thereby clearly shown to be entirely different from that represented to the parishioners by Father Papp. Mr. Toolan attended the meeting of the parishioners in September, 1924, at which the action for the adoption of the new charter was taken and he testified that at that meeting he read the statute (the supplement of 1914) and explained what it meant. "First I explained that the local parish would lose control of the management and direction of its affairs, as well as the title to all of its property and estate; that it would go over to the bishop, the chancellor of the diocese, the pastor and the two lay trustees, and that it meant that the bishop was the actual boss of the *Page 490 
church and the church property. * * * That they were going to transfer title, that the corporation as such was to lose jurisdiction over it and that the bishop or the new church order, would direct their destiny from a religious point of view from that point on * * * it was intended to divest the corporation as it existed under the old charter of its physical assets." Such testimony coming from so reputable a member of the bar of this state would ordinarily be accepted as conclusive in this court without question, and is accepted in so far as it relates to his own acts and as to what he saw and heard, with due allowance for the fallibility of the human memory and of one testifying of events nine years after their happening. But it cannot be accepted as conclusive on the question of what the parishionersunderstood. That is something which no one but themselves could know. They may have appeared, to one not of their own nationality or language, to have understood; but the testimony of the majority of witnesses on both sides as to what was said and done, shows clearly to me not only that they did not understand but that they could not have understood. I am convinced of this by contact with them on the witness stand and by my observation of them in open court. Of course they could understand their reverend father when he spoke to them in their own language; but it is significant that, although he says he explained in the Slavonic language what Mr. Toolan said, he also, according to his own testimony and that of most of the witnesses testifying on both sides, explained to his parishioners that the effect of the proposed action would be the exact opposite from what Mr. Toolan said it would be. Mr. Toolan said they would lose control of their properties — Father Papp said they would not. Assuming that they understood what Mr. Toolan said — who were they most likely to believe, the lawyer who spoke in English or their own pastor who spoke to them in their own language? Accepting his own testimony as to what he told his parishioners, it is plain that Father Papp did not tell them the truth. He did not repeat what Mr. Toolan said, except as he was pleased to translate and interpret it. He admits that the majority of *Page 491 
his parishioners could not understand English and that it was necessary for him to translate. He did not explain the act, because "the act is plain and clear" — he translated it — a futile thing to this mass of uneducated people. Father Papp admitted, however, the making of practically every statement attributed to him as to the necessity for incorporation under the 1914 act, the adoption of a new charter and the effect thereof. He particularly admitted that he stated that the church charter had been forfeited or lost; that it was unfit for a church organization, and that under it there was no guarantee that the parishioners would adhere to the Greek Catholic faith. He testified that on his arrival in Perth Amboy he found that the existing charter did not insure that the church would remain Greek Catholic; that it could be changed at any time by the parishioners and that he suggested the new charter so that the church would forever remain Greek Catholic. Complainants' witness Brinsko testified that the objection to the old charter was that a continuance in the Catholic faith was not certain under it; that those in favor of the change thought that if a majoriy of the parishioners chose they could change their faith at any time and call an orthodox non-Catholic pastor, if they desired to do so. That there was no warrant in fact or in law for any such statement, see Grupe v. Rudisill, supra; Schilstra v. VanDen Heuval, 82 N.J. Eq. 155; The True Reformed Dutch Church ofParamus v. Iserman, 64 N.J. Law 506. What Father Papp did say, in Slovak, not understood by Mr. Toolan, is abundantly shown by the testimony already recited. Mr. Toolan speaks the truth as he sees it and is undoubtedly sincere in what he says. Brinsko also testified that the Reverend Papp told the parishioners that the church property would still remain under the trusteeship of the board of trustees and that neither the bishop nor his heirs could ever sell it; that the old charter was like a Salvation Army charter, and that if the people, by a majority vote, wished to be independent or non-Catholic and wished to have an orthodox priest they could do so, while under the proposed new charter they could not. This testimony is strongly corroborative of *Page 492 
the defendants' contention respecting the Reverend Papp's misrepresentations. One of the defendants' witnesses, Mrs. Gengor, testified that at the September, 1924, meeting, Reverend Papp said: "Some outsider told you that if you recognized the bishop you are going to lose all right what the people got in this church. It is not true. * * * Nobody want to interfere with your business. You won't believe me, what I say, I swear by the living God, bishop, if you recognize bishop, he got nothing to do with your financial business or with church property." This testimony was not denied although Father Papp had plenty of opportunity to do so. But as straws indicate the direction of the wind, so circumstances point to the truth where the testimony is in conflict. The subsequent conduct of all the parties to this controversy indicates, it seems to me, more clearly than anything else can, that the effect of the action taken at the September meeting was misunderstood. This misunderstanding was induced by misrepresentations of both fact and law. While it is true that "statements of mere matters of opinion or judgment, although known to be false, do not constitute fraud in the absence of relations of trust and confidence" (Wise v. Fuller, 29 N.J. Eq. 257), the relation of the Reverend Papp to this congregation was superlatively one of trust and confidence and his misrepresentations of either fact or law, under the circumstances, constituted equitable fraud. As already stated, notwithstanding the attempted reincorporation, the old trustees continued to function as in the past, and Reverend Papp himself says that after the reincorporation the people ran the church the same as before because "I did not see any necessity to change the method and the manner of management because the people was the same, the church was the same, the religion was the same, and so far they did not interfere with the requirements of the new charter and the action was for the benefit of the people and they didn't do no harm to the church; I didn't see any necessity to change." The evidence abundantly indicates that both before and after the attempted incorporation under the 1914 act the trustees and the parishioners were jealous of their right to control the church property. *Page 493 
So insistent were the trustees upon the exercise of this right that in April, 1924, when a mortgage on a portion of the church property was about to be executed, and the lawyer for the mortgagee explained that it was necessary only that that mortgage be signed by the president and secretary, a meeting of the officers and trustees was held at which the matter was heatedly discussed and all of the trustees insisted upon signing the mortgage, and did so. It was not until Father Lukats came in November, 1931, that there was any intimation that the congregation had not been acting properly in annually electing seven trustees and the other officers as had been the custom prior to 1924. He received an order from the bishop early in December "that we must go by the church law and the state law and does not go by this." He understood the law to be the 1914 act and that the word "this" referred to the old charter; and the custom of electing trustees as observed by this congregation. He was instructed to enforce the law. He offered a fifty-fifty arrangement which the people refused, and he then told the people that they must bring the books and money to his office and that if they did not "we must go to court." Father Lukats testified that when he was sent to Perth Amboy to succeed Father Papp he was told by the bishop that "everything is in force" but when he arrived he found "it was different." At the annual meeting on February 7th, 1932, he told the parishioners that "they could not elect any more officers as they had in the previous time, because the bishop and the bishop's chancellor say they elect their own lay trustees, that means bishop's corporation like, so Father Lukats cannot accept any officers that will be elected at that annual meeting from that time on. Then the people were against it." See testimony of Sestcrak.
An examination of the minutes of the various meetings of the officers, trustees and parishioners of this congregation, subsequent to 1924, shows that Father Papp was gradually attempting to increase his control over the financial affairs of the parish and that this caused considerable dissatisfaction; that he was accused of having misappropriated funds of the church and that the matter came to a climax just *Page 494 
prior to his departure in 1931, when he admitted some defalcations and paid back into the church treasury $900 in cash. The testimony shows that $4,219.75 was collected by the Reverend Papp and not accounted for and that in September, 1931, he paid back the $900 just prior to a parochial meeting which he reluctantly called. Brinsko, one of complainant's witnesses, claims $2,969.90 collected and not accounted for, and defendants insist that the shortage is even larger than the sum first mentioned. That there was increasing discord in the congregation as a result of Father Papp's grasping for control of church finances is emphasized by the fact that his departure from Perth Amboy was accomplished surreptitiously in the small hours of the morning. Prior to his departure the question of instituting proceedings to void the action of 1924 had been raised and he was requested to call a meeting of the parishioners to discuss that question but he refused to do so. He left on November 8th, 1931. But the real trouble started after Father Lukats came and when he refused to administer the oath of office to the seven trustees elected by the people. This was in February or March, 1932, and immediately thereafter the defendants took steps toward legal proceedings to void the 1924 action, but the complainants anticipated them and filed the present bill first. The usual faith of the parishioner in his priest as one in whom implicit trust can be placed is a factor not to be ignored in this controversy and that undoubtedly materially aided Father Papp in accomplishing his purpose. (Here follows a discussion of the alleged fraud and its effect which is omitted from this report by direction of the court.)
"Fraud, in * * * equity, properly includes all acts, omissions and concealments which involve a breach of legal or equitable duty, trust or confidence, justly reposed, and are injurious to another, or by which an undue and unconscientious advantage is taken of another." Howard v. West Jersey and Seashore RailroadCo. (Court of Chancery, 1928), 102 N.J. Eq. 517; affirmed,104 N.J. Eq. 201.
To constitute a fraud by false representation such as will entitle the complaining party to relief, three things must concur: (1) There must be a false representation; (2) the *Page 495 
complaining party must have believed it to be true, and relied upon it, and have been deceived thereby; (3) and it must appear that the representation was of some matter or thing relating to the contract or transaction in or about which the representation was made, so that, if true, it was to the advantage of the party to whom it was made, and, being false, caused him damage and injury. Byard v. Holmes 34 N.J. Law 296."
Fraud may be based on conduct having the effect, as intended, of misleading. Berkowitz v. Lyons, 98 N.J. Law 198.
"An undue concealment of a fact to the prejudice of another, which one party is bound in conscience and duty to disclose to the other, and in respect to which he cannot innocently be silent, constitutes a fraud against which equity will relieve."Nicholson v. Janeway, 16 N.J. Eq. 285.
"A misrepresentation without intent to deceive will not sustain an action at law for deceit, while in equity an untruthful representation of a material fact, though there be no moral delinquency, is deemed to be fraudulent." Commercial CasualtyInsurance Co. v. Southern Surety Co., 100 N.J. Eq. 92;affirmed, 101 N.J. Eq. 738.
Fraud is none the less fraud because it succeeds. Brittingham
v. Huyler's, 118 N.J. Eq. 352.
If a case of fraud be established a court of equity will set aside all transactions founded upon it by whatever machinery they may have been effected and notwithstanding any contrivance by which it may have been attempted to protect them." Kerr Fr. 43,44; Turner v. Kuehnle, 70 N.J. Eq. 61.
Can there be any question as to the misrepresentations of Father Papp and his missionaries? I think not. In view of the many false reasons assigned for the action taken at the meeting in September, 1924, it is unlikely that there was any unanimity of opinion as to the reason or purpose of that action. There were probably as many different ideas as to the object as there were arguments advanced for it. What the people were voting for was altogether uncertain — except that the opinion was all but unanimous that they must vote *Page 496 
in the affirmative to "recognize their bishop, from their own country and of their own flesh and blood," who was about to arrive. The same misrepresentations responsible for the affirmative vote of the congregation at the September, 1924, meeting resulted also in the signing of the statutory consent to incorporation under the 1914 act by the trustees of the old corporation. All of these representations as to the necessity and effect of the proposed action, with the possible exception of the anticipated displeasure of the bishop, were false, known to be false, made with intent to deceive and they actually did deceive. And what the Reverend Papp did not tell his parishioners — concealment from them of the effect of what he was inducing them to do, was just as important an element of the fraud as his false statements of fact. Nor are the irregularities incident to the meeting to be ignored. They all contributed toward the accomplishment of Father Papp's purpose and enabled him not only to dominate the meeting, but in effect to direct its action in the expression of his will rather than that of his parishioners.
The duty of this court is plain under the circumstances and the complainants, defendants to the counter-claim, will be permanently enjoined from usurping the control of the properties of the Greek Catholic Congregation of St. John the Baptist, and from interfering with the defendants in the performance of their duties as officers and trustees. The decree may also provide for an accounting in accordance with the prayer of the counter-claim. *Page 497